**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **CLEARWATER TRANSPORTATION,** | § | **Case Number 19-50292-cag** |
| **LTD.,** | § | |
| | § | **Hearing Date: August 8, 2019** |
| Debtor. | § | **Hearing Time: 9:30 a.m.** |
| | § | |

**JOINT OBJECTION TO APPROVAL OF THE**
**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE**
**PLAN OF REORGANIZATION OF THE DEBTOR AND DEBTOR IN POSSESSION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

TO THE HONORABLE CRAIG GARRGOTTA,
UNITED STATES BANKRUPTCY JUDGE:

Austin Conrac, LLC ("Austin ConRAC") and the City of Austin, by and through their undersigned counsel, hereby file this Joint Objection to Approval of the Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Plan of Reorganization of the Debtor and Debtor in Possession Pursuant to Chapter 11 of the Bankruptcy Code (the "Objection"), and in support of such Objection, Austin ConRAC and the City of Austin respectfully state as follows:

## I.     OVERVIEW

1.     The Debtor seeks an order from this Court determining that the information contained in the Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Plan of Reorganization of the Debtor and Debtor In Possession Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 130] dated July 1, 2019 (the "Disclosure Statement"), is sufficient to allow a creditor to decide whether to vote to accept or reject the Plan of Reorganization of the Debtor and Debtor-in-Possession Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 116] dated June 7, 2019 (the "Plan"); however, the Disclosure Statement is deficient in the following ways:

- The Disclosure Statement fails to identify within 7 classes of creditors which of the creditors are actually secured, which ones failed to perfect liens and/or which ones have no collateral as of the Petition Date.

- The Disclosure Statement fails to identify what happened to the over $2 million dollars of trust funds collected by the Debtor pre-petition from car rental customers that was not transmitted to the City or Austin and the taxing authorities, and the Disclosure Statement fails to identify any safeguards for the trust funds under the Plan.

- The Disclosure Statement fails to address the actual cures needed both for the Austin ConRac Lease and City of Austin Concession Agreements and that they seek a unilateral re-write of those two agreements and the bonds.

- The Disclosure Statement has no information as to how the principal of the Debtor will investigate preferences and other transfers involving his own actions and the direct conflict of interest therein.

- The Disclosure Statement has no information as to how the Debtor, that is now running at consistent losses post-petition, will be able to fund any plan payments with its current fleet.

- The Disclosure Statement had no information as to how much is needed to pay the creditors in each class, the interest rates and the amounts in total, so that feasibility can be tested.

- The Disclosure Statement has no information as to what happens in the event of a default under the Plan and the Plan fails to re-vest the assets upon a Chapter 7 conversion.

- The Disclosure Statement does not explain why class treatment is contingent upon voting for the Plan and if a vote is not in favor of the Plan, treatment changes.

- The Disclosure Statement does not explain that the Plan as written violates the absolute priority rule and cannot be confirmed as written.

- The projections that are to be filed by the Debtor seven days prior to the hearing have not been filed by the Objection deadline, so there is financial information to support the feasibility of the Plan.

2.      For the reasons set forth herein, which are set forth in more detail below, the Disclosure Statement should be denied and the Plan should be withdrawn and then re-written to comply with Section 1129 of the Bankruptcy Code.

## II.    BACKGROUND FACTS

3.    On February 7, 2019, the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date").

4.    The Debtor is continuing to operate as a debtor-in-possession. There is no Unsecured Creditors' Committee appointed in the case.

5.    The Debtor is a tenant in the Consolidated Rental Car Facility (the "CONRAC") at Austin Bergstrom International Airport ("ABIA"). At ABIA, the Debtor does business as a Hertz franchisee under the Thrifty and Dollar rental car brand names. The Rental Car Facility is directly adjacent to ABIA and is easily accessible by passengers at ABIA.

6.    Under the Plan, the Debtor's business will be one hundred percent (100%) generated at ABIA. Debtor's business is not viable without generating significant profits at that one location; however, the Debtor has failed to meet any of its projections for revenues or car rental profits at that location since the Petition Date. Debtor also is in breach of its various Concession Agreements at ABIA, having diverted trust funds, which is a violation of criminal statutes. The Debtor has been required to escrow those trust funds, and the result of such escrow has caused Debtor severe liquidity issues in Chapter 11. In other words, the Debtor cannot operate profitably without using those funds. In addition, the Debtor faces great competition at ABIA and has not generated an operating profit at that location for years.

7.    The business arrangement for the CONRAC among the City of Austin, Austin ConRAC, and the Debtor is established in the following agreements: the Rental Car Concession Agreement for Austin-Bergstrom International Airport between the City of Austin, Texas and Clearwater Transportation, Ltd. dba Dollar Car Rental (the "Dollar Concession Agreement"); the Rental Car Concession Agreement for Austin-Bergstrom International Airport between the City

of Austin, Texas and Clearwater Transportation, Ltd. dba Thrifty Car Rental (the "Thrifty Concession Agreement," together with the Dollar Concession Agreement, the "Concession Agreements"); the Consolidated Rental Car Facility Master Lease Agreement for Austin-Bergstrom International Airport (and related amendments thereto) between the City of Austin and Austin ConRAC (the "Master Lease Agreement"); the Consolidated Rental Car Facility Sublease Agreement for Austin-Bergstrom International Airport among Austin ConRAC, the City of Austin and Clearwater Transportation, Ltd. dba Dollar Car Rental (the "Dollar Sublease"); and the Consolidated Rental Car Facility Sublease Agreement for Austin-Bergstrom International Airport among Austin ConRAC, the City of Austin and Clearwater Transportation, Ltd. dba Thrifty Car Rental (the "Thrifty Sublease," together with the Dollar Sublease, the "Subleases"). All of those agreements in terms of form and content were approved by the Austin City Council, the Bond Trustee and the Bondholders. To effect any change in any of these documents, the process is the same, the change has to be approved by all three parties *and* has to be offered to each of the other car rental companies at the Austin ConRAC because of the most favored nations clause in the Subleases.

8.     The Master Lease Agreement requires that Austin ConRAC enter into the Subleases who are parties to the Concession Agreements. The Concession Agreements allow each car rental company to conduct business at ABIA. Austin ConRAC is the master lessee to the Debtor holding the Subleases at ABIA. The Debtor, the sublessee of Austin ConRAC, owes monthly obligations for both base rent and for O&M. As of the Petition Date, approximately $205,556 was owed to Austin ConRAC for O&M under the Subleases, in addition to $36,375 in base rent. *See* Schedules of Assets and Liabilities, Docket No. 37, page 18. The Concession Agreements are cross-defaulted with the Master Lease Agreement and Subleases.

9.      Further, the City of Austin has a lease at ABIA for a service area directly with the Debtor.  The Debtor owes pre-petition rent in the amount of $15,881.

10.      The Debtor owes the City of Austin certain fees pursuant to the Concession Agreements as follows:

a.      a Concession Fee equal to ten percent (10%) of its Gross Receipts (¶ 4.1 of the Concession Agreements), in the amount of $190,692 as of the Petition Date; *See* Schedules of Assets and Liabilities, Docket No. 37, page 9; and

b.      a Customer Facility Charge ("CFC") in the amount of $5.95 per day per rental customer (¶ 4.2 of the Concession Agreements), in the approximate amount of $295,645 as of the Petition Date.  *See* Schedules of Assets and Liabilities, Docket No. 37, pages 8 and 9.

11.      The CFCs are used to pay certain municipal bonds, and the Debtor, by entering into the Concession Agreements, expressly agreed that the CFCs were to be held in trust and paid to the Trustee (as assignee of the City of Austin, and as defined in the Concession Agreements) on or before the 20th day of each month for the preceding calendar month of operations.  These fees are separately identified on each rental car customer's receipt.  *See* ¶¶ 4.2.1 and 4.2.2 of the Concession Agreements.  The Debtor expressly collected the fees from its customers on behalf of the City of Austin, but misappropriated those fees and did not remit those sums to the Trustee pre-petition.

12.      The Debtor owes approximately $1.5 million to the City of Austin Town Lake Bond Fund.  *See* Schedules of Assets and Liabilities, Docket No. 37, page 1.  The City of Austin Town Lake Bond Fund is a charge imposed by the City of Austin on all car rentals.  It is generally five percent (5%) of gross sales rentals.

13.     The Debtor owes the Travis County Tax Assessor $112,050 in personal property taxes as of the Petition Date and an additional $168,156 in State of Texas Rental Vehicle Taxes to the Texas Comptroller of Public Accounts.  *See* Schedules of Assets and Liabilities, Docket No. 37, pages 13 and 16.

14.     While in the course of spending funds that were held on behalf of others, the Debtor paid its principal, Monty Merrill, an exorbitant salary.  The Debtor paid its related company, owned by Mr. Merrill, the amount of $142,000 and has a "note receivable" according to the Debtor in the amount of $638,092 (essentially only a book entry), that is owed to this same related entity.  Nothing in the Disclosure Statement or the Plan discusses how these insider transactions will be investigated or resolved.

15.     On June 7, 2019, the Debtor filed its Plan.

16.     On July 1, 2019, the Debtor filed its Disclosure Statement.

17.     The Debtor's criminal diversion of trust funds pre-dated the "over-fleeting" claimed by Debtor in the "last half of 2018."  Debtor's explanation for its bankruptcy filing thus is significantly misleading.  In fact, Debtor experienced financial distress because it diverted funds, including trust funds, to its owner, Mr. Merrill, and to the company owned by Mr. Merrill, Clearwater Real Estate.  The Plan proposes to keep Mr. Merrill in full charge and ownership. The Plan thus rewards Mr. Merrill for his theft.

18.     The Disclosure Statement fails to provide information regarding Debtor's projected cash flow or ability to fund the proposed Plan.

19.     The projections to support the Plan payments have not been filed and so there is no financial support for the feasibility Plan.  The validity of Debtor's projections when filed will need to be tested against the actual results achieved during Chapter 11, according to the Monthly

Operating Report filed on July 17, 2019 [Dkt. No. 136], Debtor's cash position decreased from $300,078.32 as of April 30, 2019 to $106,466.27 as of June 30, 2019, a decrease of $193,612.05, and Debtor's reported value of its total assets decreased from $9,024.284.98 to $8,205,910.23 in that same period, a decrease of $818,374.75. (Monthly Operating Report, [Dkt. 136]). According to the Income Statement included with the most recent Monthly Operating Report, Debtor shows net losses of $240,639.90, $202,091.42, $75,139.18, and $59,732.71 for March, April, May, and June 2019 respectively. These continued net losses raise significant questions about the validity of Debtor's operations.

20.     Finally, there is no explanation for how the Debtor will be able to increase its projected income under the proposed Plan from a loss to a profit. As of the deadline to file this Objection, no additional financial information has been provided to creditors.

### III.      OBJECTION

21.     In this case, the Disclosure Statement is deficient in the following ways: (i) the Disclosure Statement fails to provide sufficient information for creditors to ensure the Plan is fair and equitable; (ii) the Disclosure Statement describes a Plan that on its face violates the Absolute Priority Rule and therefore should not be approved; (iii) the Disclosure Statement fails to provide an adequate feasibility analysis; (iv) the Debtor maybe administratively insolvent; and (v) the Disclosure Statement fails to provide an adequate liquidation analysis. Consequently, the Disclosure Statement should be denied and the Plan should be withdrawn and then re-written to comply with Section 1129 of the Bankruptcy Code.

**A.      The Disclosure Statement Fails to Provide Sufficient Information for Creditors to Ensure the Plan is fair and Equitable.**

22.     Section 1125 of the Bankruptcy Code defines "adequate information" as information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the

nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan. . ." 11 U.S.C. §1125(a)(1).  Both creditors and the courts rely on the disclosure statement for information to assist them in making an informed judgment about the plan of reorganization and, accordingly, it must provide enough information to enable interested persons to make an informed choice between two alternatives.  *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996); *In re Mickey's Enters., Inc.*, 165 B.R. 188, 193 (W.D. Tex. 1994).  It has been held that, "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Bankruptcy Code standard of "adequate information."  *In re Little*, 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991).

23.     Courts and commentators have provided lists of the type of information that should be addressed in a disclosure statement to provide adequate information.[1]  Ultimately, however, what constitutes adequate information in any particular instance must be determined based on the facts and circumstances presented by each case.  *In re Tex. Extrusion Corp.*, 844 F.2d at 1157.  The legislative history to Bankruptcy Code section 1125 reveals that the broad standards established by Congress for determining what constitutes adequate information were designed to permit a case-by-case determination of whether a particular disclosure statement was

---

[1] The relevant factors for evaluating the adequacy of a disclosure statement may include: (1) the events which lead to the filing of the bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtors while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtors; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a no bankruptcy context; (18) tax attributes of the debtors; and (19) the relationship of the debtors with any affiliates.  *See e.g., In re U.S. Brass Corp.*, 194 B.R. at 427.

adequate based on the facts and circumstances of each case. S. Rep. No. 989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907. Here, the Disclosure Statement fails to meet the standard of adequate information.

24. In cramdown situations, Bankruptcy Code section 1129(b)(2)(A) requires that a plan be fair and equitable to be confirmed. Part of the test for determining whether a plan is fair and equitable involves ensuring that the secured creditors realize the indubitable equivalent of their claims. 11 U.S.C. Section 1129(b)(2)(A)(iii). The Disclosure Statement fails to contain sufficient information for creditors to determine whether this requirement will be met and whether the Plan should be confirmed. First, there is no information as to the value of the collateral and which of the 7 secured creditors are actually secured. Second, there is no specific information as to the repayment terms (no interest rates or amounts to be paid are included).

25. In addition, the Plan proposes that the Debtor's equity holder will retain his interest in the Debtor. (Disclosure Statement, Section 6.1.5). No explanation is given in the Disclosure Statement as to why the Debtor's principal is retaining his interest while stretching out cure claims and that the unsecured creditors' payments are all without interest payments over a five (5) year period. The timing for payments to unsecured creditors is also unclear.

26. Moreover, the Disclosure Statement does not disclose or address how the officers and directors of the Debtor will be paid under the Plan, including but not limited to the insider of the Debtor, Mr. Monty Merrill. The Disclosure Statement provides no explanation as to why Mr. Merrill is entitled to all of the equity in the estate, while paying no interest to the unsecured creditors and attempting to pay cure claims over an extended period.

27. Moreover, the Debtor has failed to meet its revenue projections as set forth in cash collateral budgets provided to the Court, and there is no information provided to creditors as

to how the Debtor turns its losses around with the existing fleet of cars it has in order to pay amounts that would be due under the Plan and to re-pay Austin ConRAC's and the City of Austin's cure claims owed under 11 U.S.C. 365.

28.     Even more problematic is the Debtor treats seven classes of creditors all as secured impaired creditors but provides no information as to the actual security interests held and if those interests are actually perfected.  A review of the UCC-1s filed against the Debtor does not yield any additional answers nor does the information set forth in the schedules that lists $47,495 in accounts receivable and multiple pledges of those same accounts receivable that are purported to have been granted, leaving some as of the Petition Date as unsecured creditors and some that have not apparently filed UCC-1s to perfect their respective interest.  *See* **Exhibit A**, which is attached hereto and incorporated herein for all purposes and sets forth secured creditor classes, name of creditor, applicable lien, status, and UCC-1 filing information.  Even more curious is the Debtor's class treatment that states if you vote with us for Classes 4, 5, and 6, we will treat better than if you vote against the Plan.  As a matter of good faith by a plan proponent under Chapter 11, Class treatment shall not be contingent upon a voting agreement for or against the Plan.

29.     Further, there are no details in the Disclosure Statement as to what the Plan payments will be (i.e., the amount per month to be paid to each creditor class and/or the expense of operations).  As stated above, Debtor also lists seven (7) classes of secured creditors without listing the collateral types that make them secured creditors, the collateral values as of the petition date, or an explanation as to how each one of these creditors is actually fully secured and on what assets in particular.

30.     The Disclosure Statement further states that the Debtor will seek Court approval

for it to be considered in "good standing" under the bonds in order to get the Court to *re-write* the bond and lease documents and allow for a reimbursement from the operations and maintenance ("O&M") expense reimbursement funds, while not curing the past defaults nor the cross-defaults. It also seeks to have the cross-defaults written out of the agreements. The Disclosure Statement fails to address how the Bankruptcy Court can fundamentally re-write the unexpired leases with Austin ConRAC and the executory contract with the City of Austin. Section 365 states a Debtor can "assume assign or reject" these agreements. What the Debtor is seeking is for the Court to undertake a unilateral and fundamental re-write of the Leases (as defined below), Concession Agreements (as defined below) and the Bonds. To that end, the Disclosure Statement fails to address these critical issues with respect to the Plan and its compliance with applicable state and federal law.

31. The Plan is further devoid of **<u>any</u>** safeguards for the **Trust funds** collected by the Debtor and owed to City of Austin, specifically the CFC (as defined below) and the Bond Taxes moving forward under the Plan. This is particularly alarming in light of the Debtor's prior history of using the millions of dollars of trust funds collected by it for other purposes. In the Disclosure Statement there is no discussion of this past practice by the Debtor regarding the misuse of millions of dollars of trust funds, where all that money was spent and how it intends to safeguard these trust funds under the proposed plan.

32. Meanwhile, the Debtor's income, as reported in the Monthly Operating Reports, continues to decline at a very significant rate. The Debtor has also sold an approximate $1.4 million dollars of its fleet and continues to operate at a loss. The Disclosure Statement is devoid of any financial information (other than a one-page liquidation analysis) and a statement that Plan projections will be supplemented seven (7) days prior to the hearing regarding the

Disclosure Statement.

33.    Moreover, there is no information as to the seven (7) secured creditors that have asserted liens in security interest and pledges of accounts receivable, nor as to which one actually has priority and what collateral secures each of the seven (7) secured creditors.  It appears, from the limited information provided, that the Debtor has pledged its accounts receivable multiple times to multiple creditors, but there is no disclosure as to which factoring creditor has what lien priority in the Debtor's collateral and of these alleged factoring creditors which ones are actually unsecured and should not be treated as secured creditors.  The Disclosure Statement needs to clearly state this information, because reducing the number of secured creditors will free up much needed cash for operations and for the payment of Cure Claims.

34.    For the large group of secured creditors, all of which are listed as impaired, there is no disclosure as to what the actual impairment is to the secured creditors in Classes 1 through 3.  Since the Debtor intends to comply with the terms of the existing credit agreements for classes 1, 2, and 3, if there were no pre-petition defaults then, for these creditors, there actually *is no impairment* since they are getting exactly what they bargained for under their respective agreements.  As stated by the Debtor in the Disclosure Statement, "[a] class is 'impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims…" Disclosure Statement page 7.  Based upon the Debtor's own definition, Classes 1 through 3 appear to not be impaired at all.

35.    Additionally, there is no disclosure as to what rates of interest will be repaid to these secured creditors (other than a statement that the contractual rates will be paid) nor what amounts will need to be paid monthly under the lending and factoring agreements.  There is no schedule for such payments and there needs to be some discussion as to how the Debtor will

make the payments with the existing fleet of cars it now owns.[2]  The fleet having been reduced and sold off during the Chapter 11 case by $1.4 million from book value of $6,497,694 to $5,034,276.24 (Monthly Operating Report, [Dkt. No. 136]).  Without this information the creditors and the Court would not have the tools to measure of the feasibility of the Plan.  As this Chapter 11 case has proceeded, the Debtor has only lost market share by making only a fraction of its projected income (as set forth in the cash collateral orders), and there is no information as to how the Debtor intends to turn this around and become profitable enough to pay creditors according to its proposed Plan.

36.     Further, the lack of disclosure is even more apparent with respect to insider transactions.  For example, the Debtor continues to pay rent to Clearwater Real Estate.  The Debtor has admitted in Court that it is not getting any benefits from its alleged lease with Clearwater Real Estate.  Clearwater Real Estate was paid $10k a month pre-petition and post-petition (*the one lease that was kept current by the Debtor with no defaults is this lease to the Debtor's co-owned affiliate*).  Under the proposed Plan, the Debtor will continue to pay $5,000 per month under the lease between it and Clearwater Real Estate.  What benefit, if any, the Debtor will get from the "new" lease and how the Debtor intends to precede with investigating this insider transaction and the return of both the pre- and post-petition amounts is not disclosed.

37.     The Debtor has a note receivable of $638,092 from Clearwater Real Estate that it states will be repaid upon the sale of Clearwater Real Estate's property.  The Debtor fails to disclose the time for any such sale, the number of offers it has received previously, and what efforts it has undertaken to get the property sold and the note receivable paid back to the Debtor.

---

[2] Austin ConRAC reserves the right to assert any and all confirmation objections in connection with a hearing to confirm the Plan.  Austin ConRAC recognizes that the hearing to approve the adequacy of information contained in the Disclosure Statement is not generally the appropriate forum to litigate the confirmability of the proposed Plan; however, in this case, the provisions are so patently outside the standards that the Court should consider if the Disclosure Statement and Plan are so lacking in compliance with Chapter 11 that they cannot be approved for solicitation and voting.

38.     Furthermore, the estate reserves all of the causes of action to the reorganized Debtor but fails to address the irreconcilable conflict of interest the Debtor would have prosecuting the approximate $468,000 it paid to its CEO, Monty Merrill, in distributions and salary and the return of the approximate $142,000 to the CEO's affiliated companies.

39.     Under the Plan, the Debtor is asking for 10 days' notice of default on each seperate default under the Leases with Austin ConRAC and under the Concession Agreements with the City of Austin, but it fails to identify what happens if the default is not cured. Presumably the agreements can be terminated after 10 days' notice but that is not specified. The number of ten (10) day defaults also appears to be unlimited, such that the Debtor could always be ten (10) days late on payments of post-confirmation Rent under the Leases with Austin ConRAC and the concession fees to ABIA under the Concession Agreements.

40.     The Debtor does not disclose the amounts needed to cure defaults under the franchise agreements it holds with Hertz as the franchisor for its two brand names (Thrifty and Dollar) or if there are any other non-momentary defaults under those franchise agreements.

41.     The Plan has no provision to re-vest the property back into the estate if there is failure to complete the Plan and a Chapter 7 Trustee is appointed, and the Disclosure Statement fails to address this defect as well.

42.     The Disclosure Statement also fails to disclose or address the amounts to be paid to the insiders of the Debtor under the terms of the Plan and how the insiders will pay back the amounts that were distributed to them as equity shortly before the Chapter 11 case was filed. Simply put, the Disclosure Statement lacks sufficient information on a number of important issues and does not appear to be proposed in good faith under the Bankruptcy Code, which results in a plan that cannot be confirmed.

43.    Further, the Disclosure Statement fails to disclose risks relating to confirmation of the Plan and what remedies, if any, are available to creditors if payments are not made under the Plan.

44.    For the reasons set forth herein, the Disclosure Statement should be denied and the Plan should be withdrawn and then re-written to comply with Section 1129 of the Bankruptcy Code.

**B.    The Disclosure Statement Describes a Plan that on its Face Violates the Absolute Priority Rule and Therefore Should Not Be Approved.**

45.    Bankruptcy Code section 1129(b)(2)(B)(ii) sets forth the absolute priority rule with respect to unsecured claims.  This rule provides that a debtor may not retain its equity interests unless all creditors under a plan of reorganization receive 100% of their claims.  In other words, "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a plan] and there is little doubt that a reorganization plan in which [a junior class] retains an equity interest is contrary to this rule." *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 521 (5th Cir. 2004) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202-03 (1988)).  Under Supreme Court authority, if a plan does not provide for payment of the unsecured creditor classes in full, the plan may not even allow a debtor's former equity holders to *buy* new equity in the reorganized debtor without violating the absolute priority rule.  *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999).

46.    Bankruptcy courts have held that a plan violates the absolute priority rule when it fails provide for full payment *with interest* to the unsecured creditors while preserving the shareholder's equity.  *See In re Made in Detroit, Inc.*, 299 B.R. 170, 182 (Bankr. E.D. Mich. 2003), *aff'd*, 414 F.3d 576 (6th Cir. 2005) ("Because the Plan fails to provide for the full

payment with interest to the unsecured creditors while at the same time preserving in full the shareholders' equity, the Plan violates the absolute priority rule."); *see also In re OCA, Inc.*, 357 B.R. 72, 83–84 (Bankr. E.D. La. 2006) (holding that absolute priority rule requires that unsecured creditor class is paid in full with interest); *In re Waterways Barge P'ship*, 104 B.R. 776, 786 (Bankr. N.D. Miss. 1989) (same).

47. Here, the Plan is an alleged "100%" plan with equity retaining all of its interests, but does not pay unsecured creditors' interest over the five (5) year term of the proposed Plan, which violates the absolute priority rule and when the payments will actually be made. The cure claims to be paid under the proposed Plan over various time periods are also without any interest protection. The Subleases provide for interest to be paid on all past due amounts. (See Sections 6.2, 21.2.1 and 26.21of the Subleases and Master Lease Section 26.1)

48. It should also be noted that the provision of labor of the Debtor's owners fails to qualify as money or money's worth. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). Thus, the ongoing management of the reorganized Debtor cannot be considered in applying the new value exception.

49. Thus, in short, the Disclosure Statement describes a Plan that, on its face, violates the absolute priority rule. As bankruptcy courts have held, disapproval of a disclosure statement may be appropriate where it describes a plan of reorganization that is so fatally flawed that confirmation is impossible. *See In re U.S. Brass Corp.,* 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("This Court disapproved Debtor's Original Disclosure Statement based on a finding that Debtor's Original Plan was nonconfirmable on its face."); *see also In re Cardinal Congregate I,* 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). Consequently, because the Disclosure Statement describes a Plan that is non-confirmable on its face, the Disclosure Statement should not be

approved.

**C.     The Disclosure Statement Fails to Provide Any Feasibility Analysis.**

50.     The Debtor has not filed any projections in support of the Plan and therefore feasibility cannot be determined.

**D.     The Debtor is Administratively Insolvent.**

51.     The Debtor also may be administratively insolvent but gives no details as to how and when administrative creditors will be paid back.  Past data from the Monthly Operating Reports shows an average monthly expense of $0 for professional fees.   Payment of administrative claims would have to come from future cash flow, and these payments are not built into Debtor's projections set forth in Exhibit 3 to the Disclosure Statement.  Creditors are entitled to know (1) how much there is in administrative claims and (2) when administrative claims would be paid.

**E.     The Disclosure Statement Fails to Provide an Adequate Liquidation Analysis.**

52.     In any disclosure statement, a debtor must set forth the value that could be achieved upon liquidation of its assets.  Without an appropriate liquidation analysis, there is no way for a debtor's creditors to know whether a proposed plan is in their best interests.  In this case, the Chapter 7 liquidation analysis lacks the same fundamental information absent from the Disclosure Statement and the Plan.  Of the seven (7) classes of secured creditors, a question remains of which classes are actually secured and in what assets.  Without that information the liquidation analysis is without any substantive value and fails to inform creditors of what would happen in Chapter 7 liquidation.  A liquidation analysis should give creditors a clean picture to compare against the Plan returns.  The Disclosure Statement fails to do this, preventing parties-in-interest from making an informed judgment.

# IV.     CONCLUSION AND PRAYER

WHEREFORE, for the reasons set forth herein, Austin ConRAC and the City of Austin respectfully request that the Court deny the approval of the Disclosure Statement and grant such other and further relief to which Austin ConRAC and the City of Austin may be entitled to as the Court deems just and proper.

Dated: July __, 2019                 Respectfully submitted,

By:   */s/ Sabrina L. Streusand*
      Sabrina L. Streusand
      State Bar No. 11701700
      Stephen W. Lemmon
      State Bar No. 12194500
      Streusand, Landon, Ozburn & Lemmon, LLP
      1801 S. MoPac Expressway, Ste. 320
      Austin, Texas 78746
      Telephone:  (512) 236-9901
      Facsimile:   (512) 236-9904
      streusand@slollp.com
      lemmon@slollp.com

**ATTORNEYS FOR AUSTIN CONRAC, LLC**

and

By: */s/ Afton Trevino*
      Afton Trevino
      Texas Bar No. 24071159
      City of Austin
      301 W 2nd Street
      Austin, Texas 78701
      Telephone:  (512) 974-2282
      Facsimile:   (512) 974-1311
      afton.trevino@austintexas.gov

**ATTORNEYS FOR CITY OF AUSTIN**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been served on this 29th day of July, 2019 upon all parties requesting service via ECF notification, and/or via email or first class mail to the parties on the attached service list.

_/s/ Sabrina L. Streusand_____
Sabrina L. Streusand
